IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 7 |
| JEFFREY THOMS, ) | |
| SUE THOMS, ) | |
| ) | |
|     Debtors. ) | Bankruptcy No. 09-03683 |
| -------------------------------------------------- | |
| VAN DAELE BROS., INC., ) | |
| ) | Adversary No. 10-09033 |
|     Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| JEFFREY THOMS, ) | |
| ) | |
|     Defendant. ) | |

**ORDER RE: COMPLAINT**

    This matter came before the undersigned on April 20, 2011 for trial. Plaintiff Van Daele Bros., Inc. ("Plaintiff") was represented by attorneys David H. Skilton and Christine B. Skilton. Debtor/Defendant Jeffrey Thoms was represented by attorney Brian W. Peters. After the presentation of evidence and argument, the Court took the matter under advisement. The time for filing briefs has now passed and this matter is ready for resolution. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

**STATEMENT OF THE CASE**

    Plaintiff seeks to except debt from discharge under § 523(a)(6) for willful and malicious injury. Its claim arises out of a sale and lease-back by Debtor of 24 cows and 5 yearling heifers in March 1, 2008. Debtor asserts he entered into the transaction in good faith and did not intend to injure Plaintiff.

## FINDINGS OF FACT

In February 2008, Debtor approached Jerry Van Daele, a principal of Van Daele Bros., Inc., to secure financing. In exchange for $75,000, Debtor would sell his herd of 24 cows and 5 yearling heifers to Plaintiff and lease them back with five annual lease payments to Plaintiff of $18,784.23. The cattle would remain in Debtor's possession, on a lot owned by his neighbor next to Debtor's acreage, and he would care for them. Debtor prepared the documents for the sale (Ex. 1) and lease (Ex. 2), and neither party was represented by an attorney. To finance the purchase, Mr. Van Daele obtained a loan from Kerndt Bros. Savings Bank which he continues to make payments on. The transaction was finalized on March 1, 2008. Debtor used the $75,000 payment from Plaintiff to pay off a loan with Community Bank, previously secured by the same cattle, in the amount of $68,000 and for other personal expenses.

At the time of the transaction, Debtor was employed as a loan officer at Kerndt Bros. Savings Bank and had been Mr. Van Daele's lending officer at the Bank for approximately ten or eleven years. Mr. Van Daele testified that he thought Debtor was a friend and that he could trust him. He stated that Debtor knew him as a friend and was aware that he had helped out other family and friends in need. Mr. Van Daele said he was willing to help and trust Debtor because of Debtor's position at the bank and his rapport with Debtor. He understood that he would pay $75,000 to purchase the cattle and Debtor would lease them back and keep them at his property. He stated that Debtor made oral assurances and agreed to notify Mr. Van Daele of any changes in the amount of cattle.

In August 2008, Debtor lost his job at Kerndt Bros. Savings Bank. At the time, he believed, and assured Mr. Van Daele, that he could make the first annual payment under the lease the following March. He planned to find a job at another bank and continue working with Mr. Van Daele. There appears to be very little communication between the parties after that point in time. Debtor was only able to find part-time jobs and his income dropped to approximately $40,000 per year, before taxes.

Debtor defaulted on the first annual payment due March 1, 2009. Mr. Van Daele testified that, approximately 30 days later, on April 3, 2009, he picked up 20 cows and 7 calves from Debtor's cattle lot. Debtor testified Mr. Van Daele took 31

head of cattle plus some newborn calves. Debtor was not aware of the repossession until later and no one else was there when the cattle were picked up. Debtor's father, Fred Thoms, claims five of the cows were his, not Debtor's or Plaintiff's. Fred Thoms has filed two replevin actions against Plaintiff based on the removal of his five cows. He dismissed the first action close to the time of trial and the other remains pending in the Iowa District Court in Fayette County.

A few days after the repossession, Debtor attempted to pay the annual payment with a check written by his daughter, Emily. Debtor testified that Emily received a loan from a friend of his, Gary Zimmerman, in order to help Debtor make the payment. Mr. Van Daele refused to accept the check, telling Debtor if he wanted the cattle back, he would have to pay off the whole debt, as set out in the documents Debtor had prepared. Debtor testified that he didn't begrudge Mr. Van Daele for making that decision.

Apparently, the next time the parties discussed the matter was in August or September 2009. Mr. Van Daele saw Debtor at the fairgrounds and told him he was going to have to sell the cattle because it was too costly to keep feeding and caring for them. Debtor testified that he responded: "You've got to do what you've got to do." By that time, Debtor had come to accept this was a possibility. Mr. Van Daele sold a majority of the cattle in September 2009 and by the end of 2009 or early 2010, he had sold all the cattle, receiving approximately $20,000 to $23,000 in total proceeds. He estimates that he spent approximately $10,000 for feed from the time of repossession until the end of 2009, and had to pay someone to take care of them.

Plaintiff's brief describes the transaction as a plan, specifically targeted at Mr. Van Daele, which allowed Debtor to continue to work his herd of cattle with Plaintiff being responsible for loan payments to the bank, after which Debtor would discharge the debt he owed to Plaintiff in bankruptcy. Plaintiff cites several specific circumstances which it argues supports this version of the facts.

First, Plaintiff argues that Debtor improperly used the same cattle he sold to Plaintiff in March 2008 as security for a loan from Community Bank in June 2008. Page 390 of Exhibit 8 is a copy of the loan. It states: "The purpose of this loan is [to] purchase cows." Debtor testified at trial that this loan was to purchase fall calvers but the deal fell through because the cows he considered buying didn't look

3

good.  He stated the security for the June 2008 loan was not the cattle sold to Plaintiff, which he knew he no longer owned and couldn't use as collateral.

Second, Plaintiff argues that Debtor failed to account for the reduction in the number of cattle in the herd.  It asserts there should have been 58 head – the original 29 plus 29 offspring – but Plaintiff was only able to recover 20 cows and 7 calves on April 3, 2009.  Debtor did not keep records of the number or disposition of cattle or their offspring.

The Lease and Bill of Sale do not mention who would own future offspring of the original 29 cattle.  Debtor testified that he considered the original 29 cows and heifers to be Plaintiff's property, but he believed the calves were his to sell in order to be able to make a profit and pay the annual payment.  He explained that the five heifers would not calve until the following year and one of them died during the year.  Two of the original 24 cows died.  Thus, 26 remained of the original 29 cattle which were sold to Plaintiff.

Debtor testified that eight of the offspring died of pneumonia and one died later.  One pair of twins was born dead.  Debtor sold 12 of the offspring and he believed that two of the cows were not pregnant to begin with.  These numbers account for the possibility of 24 offspring from the original 24 cows sold to Plaintiff, excluding the 5 heifers which wouldn't calve until the following year.  Debtor testified that Plaintiff repossessed 31 cattle, along with some newborns.  A total of 26 cows remained from the herd Debtor sold to Plaintiff.  The difference, i.e. five cows, apparently accounts for those claimed by Fred Thoms.  Mr. Van Daele testified that he only picked up 20 cows and 7 calves in April 2009.

Third, Plaintiff asserts that Debtor and his father were in business together as partners and together they acted with intent to harm Plaintiff.  The harmful acts alleged include Fred Thoms' Iowa District Court litigation against Plaintiff and associated costs.  Mr. Van Daele testified that he has incurred total costs of $110,000, including the original loan he procured to enter into the transaction with Debtor, costs of feeding and caring for the cattle after repossession, and attorney fees defending against Fred Thoms' replevin action.

Both Debtor and Fred Thoms testified that they have never been partners. Although they would help each other out with transporting feed or livestock and

4

with chores, and held their cattle in the same lot, they kept their livestock businesses separate.   Fred Thoms used the name "Thoms Family Angus" with his grandchildren, i.e. Debtor's children, to purchase Angus cattle which the children showed in 4-H.   Debtor and his wife both testified that they were not a part of "Thoms Family Angus."

As proof of the existence of the partnership, Plaintiff asserts Debtor attempted to make an offer to Mr. Van Daele to settle everything, including Fred Thoms' replevin cases.   Mr. Van Daele testified that Debtor told him if Mr. Van Daele paid him $10,000, he would give that to his dad and the replevin actions would stop.   Debtor, however, testified that he told Mr. Van Daele he would like to settle with him for $10,000, but Mr. Van Daele refused because Fred Thoms was suing him.   Debtor stated that he specifically told Mr. Van Daele at the time that he was not offering settlement of anything to do with his father, Fred Thoms.   The Court notes that, as evidence of settlement negotiations are not generally accepted as evidence of the underlying debt, the parties' two versions of this conversation are not substantially relevant to the issues in this case.

Additional circumstances pointed out by Plaintiff as supporting a finding of willful and malicious injury include the transaction by which Emily Thoms received $20,000 which she attempted to pay on Debtor's debt to Plaintiff.   She received the money from Gary Zimmerman, who testified he thought Emily needed it to pay for college.   He wouldn't have loaned Emily the money if he'd known it was to pay the debt owed by Debtor to Plaintiff.   Emily testified at trial that the loan was something Debtor set up.   Debtor testified in a deposition (Ex. 14, p. 477, l. 14) that Emily set up the loan.

Plaintiff also points out that Debtor did not include it as a creditor or disclose the transaction and repossession in Schedules and Statements.   Debtor explained that he told his bankruptcy attorney about the whole thing before filing his bankruptcy petition.   He believed no debt to Plaintiff remained since the cattle had been repossessed.

## CONCLUSIONS OF LAW

The Bankruptcy Code excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

11 U.S.C. § 523(a)(6). The plaintiff bears the burden to prove, by a preponderance of the evidence, that the debt is both willful and malicious. In re Patch, 526 F.3d 1176, 1180 (8th Cir. 2008). As the primary purpose of the Bankruptcy Code is to provide debtors with a "fresh start", exceptions to discharge are generally narrowly construed against the plaintiff. In re Kline, 65 F.3d 749, 751 (8th Cir. 1995).

In Kawaauhau v. Geiger, the Supreme Court affirmed an Eighth Circuit decision that a medical malpractice claim was dischargeable in bankruptcy. 523 U.S. 57 (1998). The Court held that "willful" means a "deliberate or intentional injury" not merely a "deliberate or intentional act that leads to injury." Id. at 61. Also, the Court noted the similarity between the terminology used in § 523(a)(6) and common law intentional tort and stated that evidence of recklessness does not qualify as willfulness. Id. at 57-58. In Patch, the Eighth Circuit further stated that willfulness can be inferred if the debtor knew injury was "certain" or "substantially certain" to occur as a result of the conduct. 526 F.3d at 1181. The "malicious" element requires the plaintiff to show that the debtor's conduct was targeted at the plaintiff, at least in the sense that the conduct was certain or almost certain to cause the plaintiff harm. In re Porter, 539 F.3d 889, 894 (8th Cir. 2008); In re Madsen, 195 F.3d 988, 989 (8th Cir. 1999).

The Eighth Circuit has noted:

> Debtors who willfully break security agreements are testing the outer bounds of their right to a fresh start, but unless they act with malice by intending or fully expecting to harm the economic interests of the creditor, such a breach of contract does not, in and of itself, preclude a discharge.

In re Long, 744 F.2d 875, 882 (8th Cir. 1985). Courts are more likely to find conversion of collateral malicious if the debtor made attempts to conceal the disposition of the collateral from the creditor, placed proceeds in a separate account, or covered up a scheme. In re Steil, 2006 WL 2662694, at *3 (Bankr. N.D. Iowa 2006).

In Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993), the court considered whether the debtors' failure to return the correct number of cattle upon termination of a dairy cattle lease constituted willful and malicious injury under

6

§ 523(a)(6). It upheld the bankruptcy court's finding that the cattle count discrepancy resulted from poor recordkeeping rather than a deliberate attempt to cause financial harm. Id.; see In re Hofmann, 144 B.R. 459, 465 (Bankr. D.N.D. 1992) (finding the financial harm was "simply the result of sloppy inventory records, and a flexible, but not particularly practical, business relationship."), aff'd 5 F.3d 1170 (8th Cir. 1993). In contrast, in In re Bullington, 167 B.R. 157, 162 (Bankr. W.D. Mo. 1994), the court found debt nondischargeable under § 523(a)(6) where the debtor signed a financing statement for 104 cows when he only had five in his possession. Additionally, as to a separate lease of 132 cows, the court found willful and malicious injury where the debtor admitted selling the collateral and offered no explanation of what happened to the proceeds. Id.

In In re Claassen, 93 B.R. 192, 194 (Bankr. D. Neb. 1988), the debtors' records showed that, of 34 cows used as collateral, two had died and 32 had been sold over a period of three years. The court held that, while this was a violation of the security agreement, it was not willful and malicious injury because it happened over an extended period of time, the proceeds were accounted for, and the sales were in the ordinary course of the debtors' business. Id. at 196.

## ANALYSIS

Plaintiff advances a theory whereby the various circumstances of this case accumulate to prove that Debtor, along with his father, concocted a scheme to trick Plaintiff out of its money. If there was evidence of this scheme, grounds may arguably be established to except the debt from discharge for willful and malicious injury. However, as is evident from the testimony and the Closing Argument and Post-Trial Brief, Plaintiff argues for conclusions which are not supported by the evidence.

Debtor and his father did not operate as a partnership. None of the evidence presented supports that conclusion. Although they kept their cattle in the same lot, they did not commingle records or even use the same accountant to prepare their tax returns. All of the witnesses testified that no partnership existed. In the absence of proof of a partnership, none of Fred Thoms' actions have any relevance in this adversary proceeding.

7

Prior to the March 2008 transaction, Debtor and Mr. Van Daele were friends. After the transaction failed, it is understandable that the previous friendship and trust they felt was shattered. Both parties expressed sadness about this result. Plaintiff, however, has not offered any proof that Debtor ever specifically intended to hurt his former friend. Mr. Van Daele testified that he doesn't understand why Debtor would go after him this way, because he had trusted Debtor. No evidence of any possible motive appears in the record which would give Debtor reason to specifically hurt Plaintiff.

It is apparent that the parties entered into a complex financial transaction, without legal counsel, based solely on their friendship. Many of the specifics which Plaintiff now claims were inappropriate were never addressed in the original agreement. Nothing in the documents provides for what would happen to the offspring of the cattle that were transferred between the parties. Other instances of miscommunication, or lack of communication, appear to pepper their subsequent actions. Plaintiff did not give Debtor notice that he was coming to pick up the cattle. Debtor did not notify Plaintiff of the loss of some of the cattle or keep records of calves. He talked to third parties about the claim that some of the cattle belonged to his father, instead of telling Mr. Van Daele himself.

The documents on which the parties relied for the sale and lease transaction are very sparse in defining each party's rights and duties. Nothing in the record indicates Plaintiff monitored his cattle during the year the sale and lease were in effect. Debtor testified that he did not keep written records regarding the births or sales of the calves. The parties had opposite understandings regarding their rights to the calves. Mr. Van Daele believed the offspring of the cattle were his; Debtor believed he could sell the offspring, in part to pay the annual lease payment.

No one involved anticipated that Debtor would lose his well-paid job at a local bank six months after the parties' transaction, and be unable to find another one. Prior to the transaction, he had a stable work history, as known to Plaintiff. Nothing in the record indicates that Debtor intended not to repay the debt to Plaintiff at the time it was incurred. Subsequently, Debtor hoped he would remain solvent and be able to pay the debt, but that did not come to pass. He obviously feels bad about the circumstances – breaking his friend's trust and having to file a bankruptcy case.

In summary, the Court concludes that Plaintiff has failed to prove, by a preponderance of the evidence that Debtor committed deliberate or intentional acts which were substantially certain to cause Plaintiff harm or targeted at Plaintiff. Rather, Debtor got into financial trouble after losing his job, which led to a default in payment on the loan from his friend. The lack of records, and misunderstandings regarding the ownership of the offspring of the original cattle, led Plaintiff to suspect Debtor of wrongdoing. Little, if any, evidence, however, supports a finding of wrongdoing. Willful and malicious injury under § 523(a)(6) is difficult to establish. This record does not reach the required level of proof.

**WHEREFORE**, the Complaint to Determine Dischargeability is DENIED.

**FURTHER**, Plaintiff's claim is not excepted from discharge for willful and malicious injury under 11 U.S.C. § 523(a)(6).

**FURTHER**, judgment shall enter accordingly.

Dated and Entered: June 8, 2011

PAUL J. KILBURG
U.S. BANKRUPTCY JUDGE